*R. A. Harrison, George S. Peters* and *George B. Okey, contra.*

---

1 Dec.
295.

# ENACTMENT OF LAWS.

[Summit Circuit Court, September Term, 1893.]

Baldwin, Caldwell and Hale, JJ.

STATE OF OHIO EX REL. ROGERS V. JOSEPH P. PRICE.

1. EXISTENCE OF A LAW DETERMINED BY HOUSE AND SENATE JOURNALS.

In determining the existence of a statute, the house and senate journals may be examined, notwithstanding the act appears in the annual laws with the required certificate of the speakers of each house, and the usual certificate of the secretary of state appended to the volume.

2. ACTS OF 1891 ARE BOTH INVALID.

Neither of the acts appearing in vol. 88, O. L., 256 and 279, were ever passed by either house, nor was the same act on the subject passed by both houses. Neither is a valid act.

3. COURT CANNOT CONSIDER INVALID LAWS.

Where an act is plainly invalid for other reasons, it is beyond the duty of the circuit court to pass upon its constitutionality.

QUO WARRANTO.

BALDWIN, J.

This is an action in *quo warranto*, brought to test the right of the defendant to the office of street superintendent of the city of Akron. The information sets forth that Akron is a city of the second class, having by the census of 1870, a population of 10,006, by that of 1880, a population of 16,512, and by that of 1890, a population of 27,601.

That no action has ever been taken under secs. 1582-1588a, Rev. Stat., to advance the city to a higher grade or class.

That in April, 1893, John C. Woehler was elected city commissioner under sec. 1707, Rev. Stat., and qualified by presenting a proper bond, which was rejected by the city council for the alleged reason that this section 1707 had been superseded by an act passed March 31, 1891, entitled "An act to abolish the office of street commissioner in certain cities of the third and fourth grade, second class, and to create the office of street superintendent."

That the city council elected the defendant to that office under that act, and he is in possession of the office.

That the said act was never legally or duly passed, and if it had been, was in violation of sec. 26, art. 2, and sec. 1, art. 13, of the constitution.

The answer denies the election of Woehler, on the ground that there was no such office, and denies that no steps have been taken to advance Akron to a higher grade or class, and denies that the act of 1891 was not duly or legally passed. The other issues are legal.

It is admitted that no steps have been taken to advance Akron, and the journals of the house and senate of 1891 are introduced under protest, to show that the alleged act of 1891 was never passed.

The alleged act of March 31, 1891, appears twice in 88 O. L., at pages 256 and 279. Both bills purport to be house bill No. 1460, and to have been passed March 31, 1891, and both purport to have been signed by the speaker *pro tem.* of the house and by president of the senate. It is only necessary to recite the first section, which is the one on page 279, and is as follows:

"SECTION 1. Be it enacted by the general assembly of the state of Ohio: That in cities of the second class, third grade, which at the federal census of 1890, had, or at any subsequent federal census, shall have, a population of not less than 27,590, nor more than 27,720, and cities of the second class, fourth grade, which at the federal census of 1890, had, or at any subsequent federal census shall have, a population of not less than 6,490, nor more than 6,515, the office of street commissioner is abolished; and in lieu thereof there is created the office of street superintendent. The said street superintendent shall be appointed by the council, or a majority thereof. He shall be appointed for such time, not to exceed one year, as the council may see proper, and may be removed from office at any time a majority of the council may by vote determine upon, and his successor appointed as herein provided."

This, by its terms, includes Akron, which, by the federal census of 1890, had a population of 27,601.

The first section of the act, on page 256, is exactly similar, save that the limit is placed at 27,690 to 27,720, which excludes Akron.

The eventful history of these acts appears in the house and senate journals. Both originated in house bill No. 1460. As originally passed in the house, it did not in any manner include Akron. In the senate (journal pp. 464-5, March 25, 1891) it was made by a double description to include Akron, by amendment, as follows: "In line three, after the word "class," insert "third grade which at the federal census of 1880 had a population of 16,512, or at the federal census shall have a population of not less than 27,500, nor more than 27,790." With this amendment, the bill was lost, but on the same day (page 473) the vote was reconsidered, and the bill was passed.

The next day (house journal) it went to the house, asking a concurrence in the amendments, but the amendment was stated in the message, "at any federal census shall have a population of not less than 27,690"—Akron having, as before said, less than 27,690.

These senate amendments, so misrecited, were concurred in. Under date of March 31, 1891, house journal, p. 628, it is recorded that the joint committee on enrollment had examined and found correctly enrolled, "H. B. No. 1460: To abolish the office of street commissioner in certain cities of the third and fourth grades, second class, and to create the office of street superintendent. And the speaker *pro tem.*, in presence of the house, signed said bills and joint resolution."

The senate journal of the same day (pages 512-513) shows transmitted from the house: "H. B. No. 1460: Mr. Taylor, of Champaign.—The president *pro tem.* of the senate, in the presence of the senate, signed said bills."

The two bills, instead of one, as certified by the secretary of state, to be signed by the president of the senate and the speaker of the house, we have already described. As actually passed by both house and senate, the bill contained the words "third grade which at the federal census of 1880 had a population of 16,512," which are omitted in the bills as signed and certified by the secretary of state. The senate and house did not, in fact, pass the same identical bill, the lower limit in one being 27,590 and in the other 27,690.

Comparing the published volume of laws with the journals of the house and senate, we come to the conclusion:

That neither of the acts found in the volume of laws was ever passed by either house or senate.

That both leave out the following, "third grade, which at the federal census of 1880 had a population of 16,512," which meant Akron, and which was in

the bill as passed by the house and as passed by the senate. That the act on page 279, O. L., in reading "shall have a population of not less than 27,590," follows the act passed by the senate, but not the one passed by the house. That the act on page 256, 88 O. L., in reading "a population of not less than 27,690," follows the act passed by the house, but not the one passed by the senate. That the house and senate did not pass the same act, and that neither the act passed by the house or the one passed by the senate, was ever signed by the presiding officer of either or both houses.

In this remarkable condition of legislation, it is said that the certificate of the secretary of state, at the end of the annual volume of laws, is conclusive, and that it cannot be impeached by the introduction in evidence, of the journals of the house and senate.

These journals are kept by express direction of the constitution, sec. 9 of art. 2, providing: "Each house shall keep a correct journal of its proceedings, which shall be published. At the desire of any two members, the yeas and nays shall be entered upon the journal; and on the passage of every bill in either house, the vote shall be taken by yeas and nays, and entered upon the journal; and no law shall be passed in either house, without the concurrence of a majority of all the members elected thereto."

There is every reason why a book so explicitly provided for by the constitution itself, should be considered the highest evidence, and such is the view of the Supreme Court.

"Were it otherwise, a bill might become a law without receiving the number of votes required by the constitution. The plain provisions of the constitution are not to be thus nullified, and the evidence which it requires to be kept under the supervision of the collective body, must control when a question arises as to the due passage of a bill."

*Fordyce* v. *Godman*, 20 O. S., 1-17; *State* v. *Moffatt*, 5 O. S., 358; *Miller* v. *State*, 3 O. S., 475; *State* v. *Smith*, 44 O. S., 348.

And the court will even take judicial notice of these journals to determine such questions. *State* v. *Smith*, 44 O. S., 361.

It is suggested that when the senate amendment was reported to the house as reading "not less than 27,690," instead of 27,590, as was the real fact, that the mistake was clerical, and that the house intended to pass the same bill. It is beyond the power of the court to reform the journal of the house of representatives, or to rely upon any evidence against its own journal, as to its intention or action.

In the case of *State ex rel. Moffatt*, 5 O. S., 362, the vote of one house shows the election of Samuel Moffatt, and the other of Lemuel Moffatt, to the office of judge. Judge Hitchcock, said: "In the case before the court, the evidence is such as to induce a belief that Lemuel Moffatt was elected at the time by him stated, an associate judge," but it was held the only proper tribunal to try this was the house, whose journal said "Samuel," and that the only relief was at the proper time to have had the journal corrected.

It is further claimed that the act, if otherwise valid, would be a violation of sec. 1, art. 13, of the constitution: "The general assembly shall pass no special act conferring corporate powers;" and of sec. 6, art 13: "The general assembly shall provide for the organization of cities and incorporated villages by general laws," etc.

But we have already decided that the act was never legally passed—there is no law to be unconstitutional, and we avoid that discussion in accordance with a well known rule thus laid down by Mr. Cooley:

"In any case, therefore, where a constitutional question is raised, though it may be legitimately presented by the record, yet if the record presents some other and clear ground upon which the court may rest its judgment, and thereby render the constitutional question immaterial to the case, that course will be adopted, and the question of a constitutional power will be left for consideration until a case arises which cannot be disposed of without

considering it, and when consequently a decision upon such question is unavoidable." Cooley, Const. Lim., 196, and authorities cited.

Says our own Supreme Court in *Ireland* v. *Turnpike Co.*, 19 O. S., 373: "An act of the legislature should never be declared unconstitutional, where the case can be disposed of on other tenable grounds."

Judgment of ouster may issue.

*H. R. Sauder, J. J. Hall, Charles Baird* and *S. R. Rogers*, prosecuting attorney, for state.

*Green, Grant & Sieber*, for defendant.